Our next case for argument is United States v. Fields. Good morning. Good morning, Your Honor. May it please the Court. My name is Hunter Labowitz. I'm an assistant federal defender from the Federal Public Defender Office in Philadelphia. On behalf of the appellant, Edward Fields, I'm joined at council table by my colleague, Catherine Ensler, who is also a member of the Tenth Circuit Bar. Your Honor, Edward Fields is a federal death row prisoner who is before the Court today on three post-conviction claims of trial counsel's ineffectiveness at his capital sentencing hearing. Two claims involve trial counsel's failure to present evidence of Mr. Fields' longstanding brain damage, as well as his troubled upbringing, both of which would have given a more complete and sympathetic picture of Mr. Fields' life, which could have led a juror to vote for a life sentence. The third claim involves trial counsel's failure to object when the prosecutor in closing argument urged the jury to sentence Mr. Fields to death based on religion and not the law. When these claims are evaluated cumulatively, the prejudice is clear, so I hope to discuss all three claims today. But before I turn to that discussion, I would just like to emphasize this is not the typical capital habeas case that comes before this Court. As the Court knows, because this is a federal prisoner case, review is under Section 2255 and not the usual Section 2254 habeas rules that require deference to a State court adjudication. Instead, as a federal prisoner who is denied an evidentiary hearing in district court, review in this court is de novo. And under 2255, a federal court must accept Mr. Fields' proffer as true and cannot resolve factual disputes without an evidentiary hearing at which both parties have an opportunity to question the witnesses. And particularly on highly fact-bound claims, such as the ineffectiveness claims before this Court, a court cannot decide a 2255 case on the cold record alone. And especially in a capital case, it is important to adhere to these rules because Mr. Fields is challenging the constitutional reliability of his death sentence. And with that framework in mind, I would like to start by discussing Claim 1 and trial counsel's deficient performance with respect to the organic brain damage issue. In terms of deciding whether Mr. Fields is entitled to an evidentiary hearing, you first have to establish that if all the evidence comes in the way that he says it will, that he would have a claim on which he could prevail. Would you agree with that? That is the correct standard, Your Honor. Yes. So in your organic brain injury claim, it necessarily incorporates our Strickland standard. That is correct, Your Honor. Okay. So I'd like to start with the question of whether this was a strategic decision by counsel to forego the evidence of organic brain injury for a number of reasons. Including no confidence in the doctor who had given the report. The only one they had at that time that pointed to organic brain injury. Your Honor, the issue about no confidence in Dr. Gelbort is reflective of cherry picking, selective culling of the record that is not reflective of counsel's entire deliberative process. There were certainly concerns at the beginning of the use of Dr. Gelbort with his report but that was early on. As the full record indicates, counsel She said this was one of the worst reports she'd ever read. That is correct, Your Honor. However, that was, as noted in both our pleading as well as the government's earlier pleadings, that was a draft report. What then happened is counsel worked with the expert to evaluate, to review his report, at which point she said, I am very happy with this. And that's in volume 12, page 553. She then proceeded after that to send Dr. Gelbort a contract for his testimony, asked him for his final report, and made arrangements for him to come to court to provide his information. But the final report never happened, did it? I thought there was this back and forth about perhaps more testing should occur, but that testing did not occur. Your Honor, Dr. Gelbort says further evaluation is needed in the report in the record. However, in his declaration, which has to be part of the record under 2255 for the Court's consideration, he says, I did not need to do any more testing. There may have been the need for medical tests but not neuropsychological tests. Well, I thought he said at some point, I raised that with counsel, but she did not get back to me. Yes, Your Honor, that is correct, but I think I'm coming to the conclusion that they weren't really finalized with any report. No, Your Honor. The record reflects that, in fact, Dr. Price, the government's rebuttal expert at trial, received Dr. Gelbort's final report. Your Honor, I think what's important is that this Court has been Was Dr. Gelbort listed as a witness? He was listed in the Rule 12.2 disclosure, which said, I'm going to be calling a psychiatrist, a neuropsychiatrist, and a neuropsychologist. I don't know about whether he was listed on the particular witness list. Was he named, or was there just this generic description? It was a generic description, but everyone understood that to be Dr. Gelbort. And, again, it was four days before trial. This is in the record at Volume 12, page 108. Ms. O'Connell, the trial counsel, sent Dr. Gelbort an email saying, I need you at trial. Dr. Woods, who did testify, is also on that email. So she tells both, two of her mental health experts, I need you at trial. But Dr. Gelbort does not actually appear at trial. And that is because counsel failed to present him. So, I mean, is it your position that four days before, that he was on her witness list, everybody knew it was him being described, that four days before she sends him an email, says, I need you at trial, and then for no reason at all, she just doesn't call him? And that there was no strategy involved in that? Your Honor, she, in her declaration, which must be credited as true, she says that I simply neglected to call him. I was overwhelmed because I was trying this case essentially solely. And, in fact, who would ever tell, and especially in a capital case, a witness four days before trial that I need you? I think you would be prepared far in advance of that with especially your mental health experts. This shows how Ms. O'Connell was scrambling to get this trial ready. Well, didn't she also have concerns that Dr. Gelbort's conclusion, which she also said don't hire him, that she would tell anyone not to hire him because she was so unhappy with him. But she was concerned that his conclusion about the brain injury was inconsistent with the factual record about Mr. Fields holding down jobs for periods, long periods of time, and his IQ testing. Well, in fact, the brain injury is consistent with his job history. As Dr. Woods testified at trial, the only time he did well in his jobs was when he was in the Navy, from which he was honorably discharged, and when he worked as a correctional officer. And the reason he did well in those jobs is because those were structured settings that provided the rules, instructions, and regulations that somebody with frontal lobe judgment problems like Mr. Fields needs. Dr. Woods specifically testified that in every other job, as did Ms. Theresa Fields, his wife, Mr. Fields would just bounce around. It was only when he was in those stable settings that he did well. Additionally, Your Honor, I think that, and it's very clear from Ms. O'Connell's declaration, she wanted to present this evidence. She said that I had – I viewed these – sorry, I viewed the brain damage as well as the manic flip to be in synergy, that there was no mutual exclusivity to those defendants. They weren't diametrically opposed to each other. No, Your Honor, because the – A manic flip is something that happens instantaneously, allegedly. I mean, that's the picture that's painted here. If you have organic brain syndrome, that is a constant. That is a disease. That is a malfunctioning brain. And there's no sudden this, sudden that. You're just not there. Right. And you can certainly have those two at the same time. And as Dr. Woods and Dr. Greenidge indicate in their declaration, there's a synergy between the two, that when he's in a manic state, as he was on the day of the crime, his brain damage complicates his ability to think rationally, to exercise good judgment, to understand the consequences of his actions. Two experts have declared, and again, that must be accepted as true at this point, that there is a combined effect from the brain damage on the manic flip defense that trial counsel presented. I mean, couldn't that be viewed differently, though, from a lawyer's trial strategy perspective? Maybe the scientists all talking together to another group of scientists could spin that. But couldn't a lawyer look at that and say, you know what, that sounds great from a scientific perspective, but I've got what I think is this bang-up manic flip defense. And I'm afraid that if I bring up this brain injury, too, that what it's going to make the jury think is that I'm just grasping at anything I can get my hands on to make an excuse. And I don't want to do that, because I really haven't been comfortable with Gilbert all this time, and instead I'm going to hit hard with the medication-induced manic flip defense. I mean, wouldn't that a reasonable thing for a lawyer to decide to do at trial? I have three responses to that, Your Honor. First of all, that may be a reasonable response. However, that is not what the record reflects. That is speculation that we cannot allow in a 20-55 proceeding. The record reflects that Ms. O'Connell decided to present this evidence, and in fact she told the government at a settlement conference that there is a synergy between these two defenses. She told the court when she asked for continuances to get more time to prepare her case that this brain damage evidence was important evidence that she needed to present. Her public presentation to both the court and the government has to be accepted as true, and it corroborates her declaration that she had full intent to present this evidence despite any initial hesitation. Additionally, and I think what I haven't mentioned yet, is that both Dr. Woods and Dr. Greenidge, as their declarations indicate, could have, had they been prepared, discussed Mr. Field's brain damage. They considered it important, but Dr. Woods said that there was some discussion, and then it dropped out because of this rushed preparation. He was also invited to trial just four days before the trial began. Dr. Greenidge said, I was not prepared at trial to address brain damage because I'm not an expert in reading raw data from Dr. Gelbort. I never got his report. So even putting Dr. Gelbort aside, you had two other mental health experts available to the defense at trial who could have worked the synergistic defense. They needed his work, though, didn't they? They had. So Dr. Woods said, I had the final report from Dr. Gelbort. I just was not prepared by trial counsel to address it during my testimony. And I think trial counsel, I mean, didn't she specifically tell one of the other two, I don't want to go there? What happened, Your Honor, is she told Dr. Greenidge that, right, I'm concerned that if you mention anything about neuropsychology, then the government will get to rebut with a neuropsychologist. That, as we detail in our briefs, is an error under Hinton v. Alabama because counsel did not understand the law of rebuttal. Once she put Dr. Greenidge and Dr. Woods on the stand, that opened the door for the government to rebut however they wanted. And, in fact, at one point she objects because there are questions to Dr. Greenidge about a psychopathy checklist on cross-examination, and she says, that's for a neuropsychologist and he's a psychiatrist. And the court says, you've opened the door to that by putting him on the stand. I thought there was a statement from her to one of the experts that was more general than that about not wanting to get into Gilbert's. The email I'm familiar with at volume 13, page 85, says that in your report, Dr. Greenidge, if you could leave out the neuropsychology, that would help counter any rebuttal. But as the court is familiar with the record, Dr. Price testified, and he's a neuropsychologist. He was the primary rebuttal witness for the government. So once mental health was placed at issue, the government was free to rebut with any mental health expert of their choosing. You can't block a neuropsychologist by not mentioning neuropsychology in your expert presentation. So we're here on the performance prong. We're talking about performance prong right now, Strickland. Yes. What did the district court do with that? The district court engaged in speculation that is not permitted and said, well, counsel must have had some reason for not presenting it. And that was contrary to what her declaration said, which must be accepted as true. I thought the district court just cut to no prejudice. Well, the district court's no prejudice finding was based on a misreading of this MRI that, you know, the district court, sua sponte, decided to raise up without any briefing by the parties. So in terms of if the court would like me to address that issue, I'm happy to do that. Go ahead. Oh. Sorry. No, so right. The court three times said, I find no prejudice because the MRI says there's no intracranial abnormality. But our case is not based on an MRI. It's based on the neuropsychological testing. And as we indicated in our initial brief at pages 46 to 47, you can have neuropsychological testing that shows brain damage, but because the MRI is simply an X-ray of the brain at a very gross level, it may not detect any functional damage to the brain. The two can exist together. Was that evidence before the district court when the district court made its ruling? The MRI was before the district court, but neither side briefed that issue as to what is the effect of the MRI. And that certainly is. Or that if you have a normal MRI, that proves categorically that there is no brain syndrome. That issue. Was there that evidence before the district court so he could make that conclusion on the record? No, Your Honor. That's simply a matter of law. As this court said in both the Barrett and Hooks cases, when they allowed evidentiary hearings, despite there being some hospital records that indicated no brain damage in the face of neuropsychological testing, that's simply a matter of accepted medical record. I'm sorry, medicine and science. And we were never given the opportunity to respond to the district court's erroneous factual medical and scientific conclusion. You're saying there was no basis then for the district court to conclude that a normal MRI did away with the entire concept of brain syndrome. Right. And even Dr. Seward, who was the government's post-conviction expert, who wrote a 99-page report, and he had the MRI before he conducted neuropsychological testing, never said the MRI is dispositive. Certainly, if that is the case, his report should have been one paragraph and not 99 pages. I think Judge Briscoe may have been, unless I misheard, which I may have, I think she was inquiring as to whether the MRI, along with other evidence before the district court, would have provided a sufficient basis for the decision. No, because the MRI was not subjected to any kind of adversarial testing where the parties could debate the significance of it. It was simply not at issue before the district court, who then determined, and I agree if there's a conclusion that Mr. Fields doesn't have brain damage, which cannot be made on this record, then it would be appropriate to say there is no prejudice. But the basis for Judge White finding no brain damage is this MRI and the MRI alone. And that is simply wrong as a matter of science, law, and medicine. I'm sorry. Go ahead. I want to focus for a minute. You keep pointing to the McConnell affidavit and saying it's over. Whatever she says was her motive. We've got to take it as true. I don't buy that at all, and I don't think that's what the Supreme Court has said or the Tenth Circuit has said. This is an objective test of whether counsel performed reasonably. And I don't think that defense counsel gets to, after the fact, say everything I did was wrong, I was deficient, and I had no strategy in any of the decisions I made. And in every instance, we have to say, well, there you have it, deficient performance. That is not what we're saying, Your Honor. Again, we are still in the, I would say, the early stages of this case, simply seeking a hearing. So under the standard of matcha broda from the United States Supreme Court, you look to see whether there is a specific and detailed proffer. Then you look to see whether that proffer is corroborated. We are not simply relying upon Ms. O'Connell's words. As I said earlier, she sent a letter, I'm sorry, she sent two motions to the court asking for continuance based on the significance of the brain damage finding. She made a representation at a settlement conference with the government saying how important this was. Dr. Woods and Dr. — Well, that was about the MRI, right? No, Your Honor. In her conviction, she was pushing hard for MRI, but now the defense thinks the MRI has no value. No, no, this is a pretrial letter from the government summarizing a settlement conference, and that's at volume 11, page 221 through 222. She says this is almost in itself a reason, the brain damage, a juror could vote for a life sentence. I mean, isn't that — that doesn't necessarily mean that she objectively believed that was her best case. I mean, at that point, she's meeting with the Department of Justice trying to settle the case so they won't go for the death penalty. And so at a settlement conference, I mean, you're going to give your best case scenario, and you're going to say to the lawyers on the other side, you're going to try to point out all the risks they have going forward. I mean, so that's — I mean, that's not conclusive evidence of how she actually felt about the case, is it? Isn't that negotiating posture? Your Honor, it's corroborative evidence of how she felt about the case. She is putting her best case forward. She knows the government is not going to just take her claims willy-nilly. They're going to check behind them. You've got to — when you're trying to get a death penalty case deauthorized, you've got to line up everything in a row. You don't come with weak evidence when you're asking the government to knock out the most serious punishment our country can impose. And so she's not alone that the jury could vote for life. Additionally, you know, again, you have to look at this progression of how the brain damage evolved. She ultimately decided to present that. That's where she asked Dr. Gelbort and Dr. Woods to come to court. She sends a contract. Well, she ultimately decided not to present it because she didn't put anybody on. That's because she failed to do it because she was overwhelmed from trying a case, a capital federal case, by herself. So her affidavit doesn't say, you know, despite knowing that it was going to gut my case and I was leaving some of the best evidence on the table, because I was overwhelmed and wanted to get through to the case, I just dropped the brain damage defense. I mean, she doesn't go that far, does she? She says, I failed to present it because I was overwhelmed. And again, I think one thing I'd like to add is that, you know, with respect to the affidavit in it of itself, Ms. O'Connell is the federal public defender for the eastern and northern districts of Oklahoma appointed by this court. This is not something like a declaration from a recanting witness or jailhouse snitch. The court relied upon Ms. O'Connell's declaration alone in the Barrett case as part of the remand for an evidentiary hearing. And that's the only other federal capital case in this district. The court relied upon trial counsel's declarations in the Barrett case to deny a hearing on some claims. So I think the declaration at this point in the 2065 proceeding has to be given weight. And I agree it's not dispositive, Your Honor. That's why I've been discussing all the corroboration of Ms. O'Connell's declaration. But it's specific and detailed enough to merit a hearing where we can ask Ms. O'Connell all these questions that the court's been asking today. Let me, if the panel is okay, I'd like to switch to the social history evidence. Yes, Your Honor. Because we have the same issues to go through with respect to that. So let's start with whether it might have been a strategic choice to question the family in ways that made it look like to support her flip theory. That, you know, here is this great guy. His life was very normal. And then they triple his antidepressant. It drives him into a manic episode. And he does this completely out-of-character thing in killing these two people. Isn't that a valid and a reasonable strategic reason not to put on the social history? Well, Your Honor, the problem with that is Ms. O'Connell did present social history. She put on multiple family witnesses who discussed his background. Twenty-two. No, Your Honor. Weren't there 22 points of mitigation? Oh, the points of mitigation were not that many witnesses, Your Honor. Right, right. Well, Ms. O'Connell was wide open at trial where the jury did hear many, many adverse facts about Mr. Fields. For instance, that he was But you don't want your own counsel to bring those up. Well, she did bring them up during the presentation of multiple lay witnesses. The jury heard that Mr. Fields' mother was scared of him, that he had committed multiple acts of domestic violence against his sister and his wife, that he engaged in hypersexuality, that he was a neglectful father. So the jury heard all these bad facts about Mr. Fields, but it was never contextualized throughout the entire troubled childhood that he had where his parents abandoned him, where he was himself physically and emotionally abused. Did the jury hear about the cow slapping and the cat hanging and the snake handling? Right, Your Honor. Where the judge specifically said, I'm going to keep that out. He drew a line at these very early childhood acts. But the jury, in both the cross-examination of multiple witnesses for the defense, in the rebuttal case from Dr. Price, and in the closing argument by Mr. Erling, the United States attorney heard point blank, Mr. Fields is a sociopath who uses and discards people. You can't get much worse evidence than that, as this Court held in the Wilson v. Sermons case. The jury heard the aggravating edge of the evidence, but never heard the mitigating side. Well, on this point, don't we have stronger evidence that it was a strategic decision by Ms. O'Connell? With respect to the social history? Correct. Well, Your Honor, again, she presented some evidence of his social history and allowed the negative facts to come out. So there's no reason to not present the entire social history. Don't we have her statements in this record saying, I want to keep this out, this crap, I think is what she referred to it as. Right, but a lot of the adverse facts came in. The government has not pointed to anything else that would have come in. There's no evidence of a strategy to take and leave this type of social history out. Well, again, her declaration says this. She had a mitigation specialist, Ms. Shettles, who was prepared to give the full social history. She had no reason not to present it. Well, she did, didn't she? I mean, so you have a few stray comments about him being hyper-sexualized and his mom being scared of him. Do you really want to then emphasize all that with a lengthy presentation on just how egregious some of his past conduct had been? It's not emphasizing, it's sympathizing, Your Honor, by showing just how troubled his upbringing had. And therefore, it doesn't at all explain what happened, but it generates sympathy. But it also, even with sympathy, it also undermines the, you know, crux of her defense, which was the manic flip. Because it paints a picture of a man, because of his upbringing, could act this way. Someone we might expect to act that way because of his upbringing. And at the same time, she's trying to paint the picture that he's normal, would have never done it except for the manic flip. Your Honor, the problem with the defense of the manic flip was it did not address any of the pre-crime behavior that labeled that led the government to label Mr. Fields a sociopath, because, as the Court earlier asked, it was focused on one specific day. The brain damage plus the upbringing focuses on Mr. Fields' entire life. And as Dr. Greenidge put in his declaration, the brain, and I believe in the Anderson case, as this Court held, as we noted in our brief, people who appear to be sociopaths but have brain damage, it is the brain damage that is limiting their judgment, limiting their reasoning, and is the far better explanation for conduct that appears to be sociopathic. Instead, here what happened is the jury is left with this view of an evil man, and that is simply not correct. This is a man who is mentally ill and brain damaged. But that just comes full circle back to you don't like her manic flip strategy. No, Your Honor. It's that they work in synergy. So the brain damage contextualizes Mr. Fields' entire life and works to explain why on that day in question he could not exercise proper judgment. And if I may just for a minute turn to Claim 3, which is the claim about the closing argument. Let me ask you this. Do you have to specifically reference God or the Bible or that's a claim you're going to, right? Yes, Your Honor. No, you do not. Okay. And so, I mean, we just assume that the jurors instinctively knew that that story comes from the Book of Daniel? Well, this is a well-known biblical tale, and as the government said in their brief at page 71, Mr. Sperling recounted an Old Testament story. Religious arguments are simply not proper in a capital case. Anyone listening to that would have known whose knowledgeable of religion would have known that the government was urging Well, who is knowledgeable of religion? There's a requirement. Yes, Your Honor, but you do not have to say God specifically. It was well over one page of the closing argument. And you're assuming that this jury is seeped in the knowledge of the Old Testament? Well, Your Honor, I see I have one minute remaining, so if the Court has any further questions, I would like to reserve a little bit of time for rebuttal. Okay. Thank you. Good morning, Your Honors, and may it please the Court, Jeffrey Cohen on behalf of the United States. You're speaking softly, so I'll bring that to you. Sorry about that. Go ahead. Thank you. I'm having trouble hearing you. You're going to need to pull that even closer. Okay. Does that matter? So the way I understood the briefing from your opposing counsel over there is that any brain damage would have been sufficient to allow them to put on this defense effectively? Well, I have two points of response to that. And the first, I think, is significant with great regard to the first problem, which is this. It seems clear that both Drs. Grenage and Woods were aware of Dr. Gelbort's findings. We know that Dr. Woods testified as much on cross-examination after studiously attempting to avoid any mention of Dr. Gelbort. And we have e-mail traffic between Ms. O'Connell and Dr. Grenage, in which she specifically asks him if he will willingly avoid mention of Dr. Gelbort's findings. And he says, in essence, no problem. Drs. Grenage and Woods were the two people in this case who truly had the expertise with which to make the case. With which to determine whether or not there was some synergy here. And ultimately, and this goes to my second point, this is not a legal determination. Whether or not to present brain damage is not a question for a court. Ultimately, the question is whether or not it matters. And it was the neuropsychiatrist and the psychiatrist who both testified that they had the ability to make the case. They did talk about brain function. In fact, did talk about brain function. It was for them to determine whether or not there was that synergy. It's obvious from their testimony and from their e-mails that they didn't think so. Or they would have raised an objection. On direct examination, Dr. Woods was asked point blank. He was asked if Mr. Fields suffered from any mental disorder or defect and the impact it might have had on the crime. If Dr. Woods believed that there was a synergistic effect between brain damage, as Dr. Gelbort had found it, he had every opportunity to say as much. But I thought we've just been through the fact that counsel told him to avoid that. Well, I think that he did. My point is that he was in a position to resist. In fact, he was the only person who could have resisted. Well, that's not normally how it works, is it? I mean, you work with your experts and you say, this is the theory we're proceeding with at trial. You prepare your expert to go that way and the expert so testifies. I mean, it's usually not going to happen that the expert's going to say, but wait a minute, I have another take on this case. Let me tell you what it is, jury. Is that what you're saying should have happened here? No. I'm saying that in the run-up to this trial, Dr. Woods was in a position, and we know that he had a conversation, at least one telephone conversation with Dr. Gelbort about his findings. He was aware of them. If Ms. O'Connell came to him and said, can we avoid this subject, it was for him to say, you don't want to do that. This is important. This makes a difference to our overall presentation. It will strengthen the case for bipolar flip. It's clear he did not do that. Both he and Dr. Grenage were willing to go forward without reliance on that evidence. Is there any evidence in the record that before trial Dr. Woods and Dr. Grenage suggested that she should proceed with this synergistic argument? I'm not aware of any such evidence. I would like to address, in fact, Ms. O'Connell's correspondence and the evolution of her apparent thinking about this evidence. As counsel has stated, there is some early, early correlation in correspondence, e-mails and letters that go back and forth starting in August of 2004. There is the ex parte declaration in which Ms. O'Connell makes reference to the brain damage evidence. There is a September 17th extension request in which she makes reference to the brain damage evidence. It's still September of 2004. In December she had a meeting with the U.S. attorney and she discussed the brain damage evidence. She apparently receives an updated report from Dr. Gelborg on March 8th of 2005. And here things begin to change. She sends an e-mail the next day in which counsel states, my claim to fame isn't brain damage. It's the manic flip due to effect sore. The flip complicated by Tylenol PM for sleep problems and then add on top maybe even some brain damage. That same day, counsel says in an e-mail, Woods, Dr. Woods is her real mental health expert and potential brain damage has some value but it's not a huge part of my case. What do we do with the declaration that she says these were decisions that were made with little time, too much pressure, not enough opportunity to prepare? I think it is this evidentiary record supports the government's position. I recognize that Ms. O'Connell filed this declaration. I do not believe it is nearly as reliable as the evidence that was produced in discovery that demonstrates her contemporaneous thinking. Wouldn't it be necessary to wade into these questions in an evidentiary hearing? I mean, you have issues of material fact here. What was her strategy? How was she pursuing it? Did she, in fact, make a decision not to call Gilbert and why? Well, it's clear that she made a decision not to call Dr. Gilbert. It's the and why part. Was it strategic or was it I'm just throwing my hands up in the air and going with something that's pretty simple to say, which is manic flip? I think that the record makes clear that she believed the mainstay of her decision was that manic flip defense. But even if it's the mainstay, if the organic brain injury could have actually been supportive of the manic flip theory, there's no reason that one would exclude the other. I mean, when she says, you know, it's not my claim to fame, she goes on in that email and at the end she's still talking about brain injury. I tend to disagree with that because, in fact, the manic flip theory had the advantage of painting this crime as a completely unique event in Mr. Field's life. To introduce in these notions of impulsivity based on pre-existing brain damage would not have been a good idea. It would have invited in the government's theory of future dangerousness. It would have tended to underscore some idea that he had a longstanding problem that, oh, this causes you to commit double murders. That was not something the defense actually wanted to do. The effects were defense avoided that problem. Well, I mean, you know, obviously you've got to make a judgment there. But what she knew, she already knew that there was going to be evidence admitted that was going to talk about the defendant's hypersexuality and some of the other domestic violence, the fact that his mother was afraid of him. There was already going to be some of that evidence coming in. And so the question is, by packaging it as an organic brain injury, does that make the jury more sympathetic and still support your flip theory? The, let me say this. First, the brain damage evidence itself was incredibly mild. Whatever report Dr. Gelbort may have produced beyond the one that was in the record, he spoke to mild deficits. Involving impulsivity and higher, I believe, higher reasoning. And then there was some discussion of attention deficits. I can't speculate as to the extent to which that evidence would have supported the effects or flip theory. It appears to me that it would not have. That, in fact, the evidence was inconsistent with the commission of the crime. Mr. Fields clearly did not have an attention deficit while he was stalking this couple on the Hill. He did not have an impulsivity issue when he prepared to commit this crime for the first time. He did not have an attention deficit for days, if not months. So while I can appreciate there being some theorizing about the possibility that this evidence would have helped and it being worth some further exploration, at the end of the day, I don't think the evidence in and of itself really gets the defense very far. Number one. Number two, Ms. O'Connell had the discretion as an attorney to make a decision about how to curate her case. This is a thing that lawyers do, and that is a rule that Strickland and its progeny respect. Well, the point here is, was this a strategic decision? That's the issue. And how do we know that without an evidentiary hearing when we have her subsequent declaration saying, you know, this is in fact what occurred, you have the record, but let me tell you why. It need not be a strategic decision. In fact, Strickland allows for the possibility that it could be a wrong decision. It could be a wrong decision, but so long as it is not an unreasonable decision, and this is not an unreasonable decision, given the relatively small weight of this evidence. Well, her declaration is trying to tell us, I think, that it was really not a decision. But that's inconsistent. She was just pushed, let's go, we're done, we don't have any more time to do anything else, it's your turn to put on an expert. I think that's inconsistent with the record. On the eve of trial, on the 19th of June, this is still two or three weeks before trial, counsel asks Gilbert for his final report, and the very same day asks Dr. Grenage if he'll avoid brain damage evidence. So she is already thinking in terms of hedging her bets. She is putting herself in a position where she can avoid this evidence if she wants to, if she feels she has to, and present it if she feels she wants to. Does it make any difference that she was an experienced death penalty lawyer? Certainly, I think that she was a qualified death penalty lawyer. Maybe, I think this was her first federal capital case, but hadn't she been counsel to two state death penalty cases? I believe that's correct. And I know much has been said about the burden on Ms. O'Connell in this trial, and I do not want to minimize her workload in this case, but she had other counsel of record in the courtroom, and she was not faced with, as is often the case, having to do two phases of a death penalty trial. Her client had pled guilty. This was a seven-day trial. This was not the burden of a six- or seven-week production. Well, on the performance problem, did the district court address it at all? I mean, we here in our discussion have gone into it pretty deeply. Did the district court, that is, did he make the determination, this was a strategic decision, and I will discount the declaration, I will look at the contemporaneous emails and discussions and records that occurred closer in time to the events, and rely on those. Did he go down that path at all? I don't recall that he did. So he went directly to the second prong of Strickland, which was there's no prejudice because of the normal MRI? I think that is something of an oversimplification. What did he rely on? Certainly, I think that the normal MRI had a lot of influence on the district court's thinking, and I think putting that MRI in context underscores exactly that point. The MRI was not a product of the government's desires. After Mr. Fields retained Dr. Martel in support of this habeas motion, they came and asked the government whether it would be possible to arrange for an MRI outside of U.S. P. Terre Haute, and we got that permission for them to support Dr. Martel's statements, his representations, that this MRI would almost certainly demonstrate evidence of either ischemia or tumor. So Dr. Martel, in essence, placed his own credibility in jeopardy when he made those statements. So it's not only the finding of the MRI. I think the district court was in a position to make a broader determination about the reliability of the evidence that was potentially before it in hearing about this matter. Now, as no small add-on to that, the MRI was normal, and the government did ultimately have Dr. Seward do a lengthy and rather complete evaluation. So the expanded record included Dr. Seward's findings that Mr. Fields did not suffer from brain damage. Would a hearing be helpful to address whether a negative MRI precludes brain injury? I don't believe so. I think that to the extent that the MRI speaks to the reliability of the two different experts who were in play in the district court, the court was within its discretion to decide that it could rely on the government's evidence. Whether it's medically true or not? So if you have two guys saying, well, if this is a normal MRI, we're done here? But the medical aspect of it was not the be-all and end-all of the reporting by the two experts. Both of them did full neuropsychological evaluations. And concluded that he did or did not have brain damage. Correct. Well, the government's expert found that Mr. Fields did not have brain damage. Dr. Martel, as of 2009, was pressing a theory that Mr. Fields suffered from a cataclysmic decline as a result of ischemia or a tumor that turns out not to exist. Can we switch to social history? With respect to social history of child abuse, being whipped, those types of things, has the Supreme Court or this Court ever held that that kind of evidence is the double-edged sword kind of evidence that could actually hurt the defendant? I can't say that the Supreme Court or this Court has ever spoken specifically to that sort of evidence. Well, to the extent it's been spoken to, hasn't it been identified as some of the most mitigating evidence you can produce? I think that it can be in some circumstances. I want to be fair here. I think that Ms. O'Connell made a choice. This was a case in which she could have presented that evidence, much like the brain damage evidence. But it would have detracted from other portions of her case. This was not a case where she could have her cake and eat it, too. She could present evidence of long-term family dysfunction, but that evidence was very attenuated by time from the crime itself, which happened when Mr. Fields was already in his 30s. And it was also attenuated by... So you're saying if you have a bad childhood, in the extreme, you just grow out of it, no problem here? I'm not suggesting that. I am, however, suggesting that to the extent that it was going to be the basis of sympathy, it would not have played a role in her case. It would not have played in the same way it would have had he been 18 or 19. The affidavit says that there was at least one whipping with a belt that happened when he was in his 30s, as I recall. That I don't recall. That's my recollection of the record. So let me understand what you're saying. You're saying that with respect to the social history, that it would not have supported the flip theory? It would have undermined the strategy? It certainly would have undercut the notion that the crime was simply the product of a chemical imbalance. And it would have detracted from the other forms of mitigation that the court's already commented on, where Mr. Fields attempted to play on the sympathies of the jury for his plight as an adult. The loss of his mother, or the loss of his father, his mother moving away. And that was sympathy that... And not merely sympathy, but also an effort to undercut the government's future dangerous presentation. By attempting to portray him as a loving and lovable human being, and not as a psychopath. So Ms. O'Connell was left with a choice. And it is within her discretion, under the Sixth Amendment and under Strickland, to make a choice. The thing about this issue, and frankly, the first, is that had Ms. O'Connell undertaken either of the strategies that she's being criticized for having failed to take, we could be here talking about precisely what Ms. O'Connell did, precisely the converse of the arguments that are presented here. Mr. Fields could just as well complain that Ms. O'Connell put on evidence of abuse that tended to undercut his attempt to portray himself as a decent, basically upstanding person who did a terrible thing, because he was exposed to a psychoactive substance. I'd like to turn the Court's attention to the third claim, that being religiously-based summation. Can't we assume that most jurors in Oklahoma recognize that story as biblical? Your Honor, I truly cannot speculate on that. Pardon? I'm in the wrong state. Wouldn't most jurors recognize, I mean, that's a pretty famous story, isn't it? The writing on the wall, you've been weighed and you've been measured. Certainly I think the phrase is well-known. But in the end, the phrase was all that was truly there of a biblical story. The prosecutor never named religion. He didn't mention the Bible. He didn't even name a biblical figure. He didn't state a religious commandment, and he did not attempt to justify the death penalty generally, or specifically in regard to this case, on the basis of something that happened in that story. So I think the fact that the prosecution has gone out of its way to do what it was supposed to do involves conduct like that, where a prosecutor has gone out of his or her way. So we're down to it was bad, but not bad enough. You won't even concede it was bad? How about stupid? Unnecessary. I mean, you have the facts of the crime here. I mean, I'd go with that. I will meet you at unnecessary. Are you aware of any case where a statement like this that has no overt reference to the Bible or to a biblical figure has been held to be basically presumptively erroneous? None. And more than that, I'm aware of cases cited by Mr. Fields in which, frankly, the prosecutors have trenched further than Mr. Sperling did that were held ultimately to not be prejudicial, among them Cohen and Bennett. So I think that while this statement may well have been unnecessary, I don't think it was. It ultimately was used to direct the jury to precisely what the prosecutor was there to do, which was to underscore for them the significance of the weighing standard in the Federal Death Penalty Act. And that's exactly where he took this ultimately. At no point did he refer back to this biblical story as the basis of his argument for seeking the death penalty. Or for imposing the death penalty. On this one, the record's clear what happened. We don't need an evidentiary hearing on this one, do we? I do not believe so. I mean, he either went over the line or he didn't. Yes. And it does point out, however, one important fact or one important argument. The defense has attempted to characterize this as an ineffective assistance of counsel claim. Government. Yes, but the government maintains that the certificate of appealability was granted for a claim of prosecutorial misconduct. Well, it's kind of, I mean, our grant is a little ambiguous, frankly. It's any constitutional claim arising, isn't it, arising out of the oral argument, the closing argument. And then in parentheses it says, limited to the reference to the Book of Daniel, is my recollection without pulling it in front of me. Whether the government's penalty phase closing arguments violated Mr. Field's constitutional rights. So by the government's reading, it is limited to the government's conduct. I'm sorry, say that again. By the government's reading of that document, it was limited to government conduct and not counsel's conduct. And so that would place this squarely within the standard for any other defaulted claim. Unless the Court has any further questions, I will submit the case. Thank you. Under 2255, an evidentiary hearing can only be denied if the record necessarily establishes that the petitioner is entitled to no relief. That's what the Supreme Court held in Machabrota. That's what this Court held in the other capital 2255 case, U.S. v. Barrett. The Court's suggestions and questions today about why counsel did or did not present organic brain damage in social history are in dispute, and it's precisely the kind of questions that need to be resolved at an evidentiary hearing. That is what the Court did in the Littlejohn case, and that was under de novo review. That's what the Court recently did in the Jimmy Dean Harris case, which was under 2254 review. When there are factual disputes, the cold record cannot control. And before we put a Federal prisoner to death, the ultimate punishment, he should at least have his claims heard in the crucible of adversarial testing. With the ultimate punishment at issue, Your Honors, law and fairness demand a remand. And if the Court has no further questions, we would ask the Court to remand this case for an evidentiary hearing on all claims. Let me just ask you a question. Under your argument that you just made, can you think of any instance where we wouldn't be required to remand for an evidentiary hearing if the claim is ineffective assistance of counsel? No, Your Honor. So every claim for ineffective assistance of counsel, there must be an evidentiary hearing in a capital case. Cases say, additionally, when there is factual dispute, which there clearly is here, we must grant under 2255. We do not speculate. We grant an evidentiary hearing. That's what Barrett says. Isn't there always a factual dispute about strategy and prejudice? And that is exactly why you need the hearing, to resolve that. Ms. O'Connell will testify. Both sides will ask her questions. The Court can make fact findings. Was her decision reasonable or not? We cannot determine that on a cold record. And that's why I was saying before, we're sort of in an early stage of the case, pre-hearing. And that's what the hearing resolves. So your answer to my question is yes. In every IAC claim in a capital case under 2255, you must remand for an evidentiary hearing. If the record indicates there are disputes that cannot be resolved, yes. Thank you, Your Honor. Thank you. Thank you both for your arguments this morning. The case is submitted. Court is in recess until 8.30 tomorrow morning.